Katherine Wagner
Inlet Law, LLC
Anchorage Office
1007 W. 3rd Ave., Suite 300
Anchorage, AK 99501
(907) 759-8765
Filings@inlet-law.com
*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ALASKA**

| | |
|---|---|
| John Doe<br>Plaintiff,<br>v.<br><br>Kristi McLean, in her individual capacity; Kristi McLean d/b/a Between Beaches Alaska; Village Public Safety Officer (VPSO) Dewey Newhouse, individually; City of Seldovia; Aleutian Pribilof Islands Association, Inc.; The Alaska Centre for Creative Renewal, LLC d/b/a Stillpoint Lodge,<br><br>Defendants. | **CIVIL DIVISION**<br><br>**Case No. 3:26-cv-00307** |

**CIVIL RIGHTS COMPLAINT AND JURY DEMAND**

Plaintiff John Doe, by and through his undersigned counsel, brings this action against Kristi McLean, in her individual capacity; Kristi McLean d/b/a Between Beaches Alaska; Village Public Safety Officer (VPSO) Dewey Newhouse, individually; City of Seldovia; Aleutian Pribilof Islands Association; and The

Alaska Centre for Creative Renewal, LLC d/b/a Stillpoint Lodge (collectively, "Defendants"), and alleges as follows:

## I. INTRODUCTION

1. This civil-rights action arises from the unlawful removal of Plaintiff John Doe from his residence through the exercise of law-enforcement authority, the disclosure and misuse of Plaintiff's highly private HIV status, interference with Plaintiff's employment, disability discrimination, and related violations of Plaintiff's constitutional, statutory, contractual, and common-law rights.

2. Plaintiff traveled to Alaska after accepting seasonal employment as a Commis Chef with Defendant The Alaska Centre for Creative Renewal, LLC d/b/a Stillpoint Lodge ("Stillpoint Lodge"), with a scheduled start date of May 15, 2026. Before beginning work at Stillpoint Lodge, Plaintiff entered into a work-for-lodging arrangement with Defendant Kristi McLean d/b/a Between Beaches Alaska ("McLean"), under which Plaintiff performed labor in exchange for temporary housing at Between Beaches.

3. While Plaintiff was residing and working at Between Beaches, McLean discovered Plaintiff's HIV medication and learned that Plaintiff was HIV

positive. McLean thereafter made stigmatizing statements concerning Plaintiff's HIV status and sexual history, warned Plaintiff that he would lose his employment if Stillpoint Lodge learned of his HIV status, and pressured Plaintiff to conceal identifying information on his prescription medication.

4. After a dispute arose between Plaintiff and McLean, McLean sought the assistance of Defendant Village Public Safety Officer Dewey Newhouse ("Newhouse") to remove Plaintiff from his residence. Although Newhouse acknowledged that Plaintiff had committed no crime and that the dispute was a civil matter, Newhouse used his official authority as an armed and uniformed VPSO to direct Plaintiff to leave the residence without a warrant, court order, eviction judgment, or other judicial process authorizing Plaintiff's removal.

5. During Plaintiff's removal, McLean threatened Plaintiff's employment with Stillpoint Lodge, telling him, "you are risking your job with Stillpoint" and asking, "You don't think they are going to hear about this? It's a small bay!" McLean then contacted JT Thurston, the owner of Stillpoint Lodge.

6. In the days following Plaintiff's removal, Stillpoint Lodge continued communicating with Plaintiff concerning his employment and scheduled

May 15, 2026 start date. On May 9, 2026, however, Stillpoint Lodge informed Plaintiff that it would no longer employ him for the 2026 season and cancelled his scheduled start date.

7. As a result of Defendants' conduct, Plaintiff was displaced from his residence in a remote area of Alaska, lost his employment with Stillpoint Lodge, incurred substantial economic losses, and suffered severe emotional distress and other noneconomic harm.

8. Plaintiff brings this action to obtain redress for the resulting violations of his federal constitutional rights and federal and Alaska statutory, contractual, and common-law rights.

## II. JURISDICTION AND VENUE

9. This action arises under the Constitution and laws of the United States, including 42 U.S.C. § 1983 and the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., and also asserts claims arising under the Constitution and laws of the State of Alaska, including the Alaska Human Rights Act, AS 18.80.220 and AS 18.80.240.

10. This Court has original subject-matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343.

11. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state-law claims because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

12. In the alternative, this Court has original jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1332(a) because the action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13. Plaintiff is a citizen of a state other than Alaska. Plaintiff's state of citizenship is set forth in the Declaration of John Doe filed contemporaneously with Plaintiff's Motion to Proceed Under a Pseudonym, Supporting Memorandum of Law, and Motion to Seal Declaration of John Doe.

14. Upon information and belief, each Defendant is a citizen of Alaska for purposes of 28 U.S.C. § 1332, and no Defendant is a citizen of the same state as Plaintiff.

## III. PARTIES

15. Plaintiff John Doe is a citizen of the United States and a resident of a state in the Lower 48. During the events giving rise to this action, Plaintiff was

present in Alaska. Plaintiff's state of citizenship is set forth in the sealed declaration filed contemporaneously with Plaintiff's Parte Motion to Proceed Under a Pseudonym.

16. Defendant Kristi McLean is an adult resident of Alaska who, during the events giving rise to this action, owned and operated a sole proprietorship doing business as Between Beaches Alaska. Upon information and belief, Between Beaches Alaska is a trade name under which McLean conducted business and is not a separate legal entity. McLean is sued individually and doing business as Between Beaches Alaska.

17. Defendant Dewey Newhouse is an adult resident of Alaska who, during the events giving rise to this action, served as a Village Public Safety Officer ("VPSO") assigned to Seldovia, Alaska. At all times relevant to Plaintiff's federal constitutional claims, Newhouse acted under color of state law while exercising or purporting to exercise his authority as a VPSO. Newhouse is sued in his individual capacity.

18. Defendant Aleutian Pribilof Islands Association, Inc. ("APIA") is an Alaska nonprofit corporation and a grantee participating in the State of Alaska's Village Public Safety Officer Program. APIA provides VPSO services to

Seldovia and, upon information and belief, employed, assigned, and supervised Newhouse as a VPSO during the events giving rise to this action.

19. The State of Alaska Department of Public Safety ("DPS") administers the statewide Village Public Safety Officer Program through its Village Public Safety Operations Division ("VPSO Division"). Established in 2024, the VPSO Division assumed responsibility for statewide administration of the VPSO Program, which had previously been administered by the Alaska State Troopers. The VPSO Division oversees VPSO training and certification, establishes statewide operating procedures, monitors grantee compliance, and provides program support. Alaska State Troopers continue to provide operational support to VPSOs. APIA participates in the program as the regional grantee serving Seldovia.

20. Defendant City of Seldovia is an Alaska municipal corporation organized and existing under the laws of the State of Alaska. At all times relevant to this action, the City provided municipal law-enforcement and public-safety services within Seldovia.

21. The Seldovia Police Department ("SPD") is the municipal law-enforcement agency operated by the City of Seldovia.

22. The City entered into a Memorandum of Agreement with APIA concerning the employment and provision of Village Public Safety Officers within the Seldovia community.

23. During the events giving rise to this action, the City identified Newhouse and another VPSO as the officers serving the greater Seldovia community through the City's partnership with APIA.

24. Newhouse and the other VPSO maintained an office in the City's police station, located within the City's Multipurpose Building. The City directed members of the public to contact the VPSOs through the telephone number used for SPD's nonemergency services.

25. The Alaska State Troopers provided dispatch and operational support to the VPSOs serving Seldovia. Emergency calls were generally routed through AST dispatch, which then transferred or dispatched calls to the appropriate local responder, including VPSOs.

26. Defendant The Alaska Centre for Creative Renewal, LLC d/b/a Stillpoint Lodge ("Stillpoint Lodge") is an Alaska limited liability company that owns and operates Stillpoint Lodge. During the events giving rise to this action,

Stillpoint Lodge offered Plaintiff seasonal employment as a Commis Chef with a scheduled start date of May 15, 2026.

27. Zack Cawvey is an adult resident of Alaska who, during the events giving rise to this action, served as General Manager of Stillpoint Lodge. Cawvey acted within the course and scope of his employment with Stillpoint Lodge in connection with the acts and omissions alleged herein.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff Seeks Seasonal Culinary Employment in Alaska

28. Plaintiff John Doe is a resident of a state in the Lower 48 who completed a two-year culinary program in 2024.

29. In April 2026, Plaintiff began seeking seasonal culinary employment in Alaska to gain professional experience and advance his culinary career.

30. In the course of his search, Plaintiff learned of Defendant Between Beaches Alaska, owned and operated by Defendant Kristi McLean, and contacted McLean to inquire about seasonal culinary work.

31. Around the same time, Plaintiff applied for employment with Defendant Stillpoint Lodge.

### B. Plaintiff Accepts Employment with Stillpoint Lodge and Relies on the Offer

32. On or about April 14, 2026, Plaintiff remotely interviewed for employment with Defendant Stillpoint Lodge. Defendant General Manager Zack Cawvey conducted the interview.

33. On or about April 15, 2026, Stillpoint Lodge offered Plaintiff employment as a Commis Chef, and Plaintiff accepted the offer.

34. Cawvey informed Plaintiff that his scheduled start date would be May 15, 2026, and that Stillpoint Lodge would send Plaintiff an employment agreement for electronic signature.

35. In reliance upon the accepted offer of employment, Plaintiff purchased airfare to Alaska for April 24, 2026.

36. On or about April 21, 2026, Plaintiff informed Cawvey that he had purchased airfare in reliance upon the accepted offer and asked Cawvey to send the employment agreement previously discussed so that Plaintiff could sign it before traveling to Alaska.

37. Later that day, Cawvey, acting on behalf of Stillpoint Lodge, transmitted to Plaintiff an electronic signature request containing a document titled "2026 Seasonal Employee Agreement" and Stillpoint's Employee Handbook.

38. Plaintiff electronically signed the Employee Agreement and Employee Handbook that same day.

39. In reliance upon Stillpoint Lodge's offer, the Employee Agreement transmitted to him for signature, and Stillpoint Lodge's subsequent communications and representations, Plaintiff traveled to Alaska, transported his personal belongings to Alaska, and organized his housing and employment plans around beginning work at Stillpoint Lodge on May 15, 2026.

**C. Plaintiff enters a work-for-lodging Agreement with McLean.**

40. On or around April 16, 2026, Defendant McLean contacted Plaintiff and asked him to come to Between Beaches before the summer season to help her prepare the property for guests.

41. Between Beaches and Stillpoint Lodge are located in remote areas off the road system, are accessible only by boat or aircraft, and are approximately a thirty-minute water-taxi trip apart. Because of Between Beaches' proximity to Stillpoint Lodge, Plaintiff considered the work-for-lodging arrangement with McLean particularly suitable as temporary housing before beginning his employment at Stillpoint Lodge

42. Plaintiff had never been to Alaska, had no personal transportation in the area, and had no friends or family nearby. McLean knew that Plaintiff would depend upon the transportation and lodging arrangements they had made until Plaintiff began his employment at Stillpoint Lodge.

43. McLean represented that she was ill and needed assistance performing work necessary to prepare and operate Between Beaches.

44. Plaintiff and McLean agreed that Plaintiff would perform work for McLean at Between Beaches in exchange for lodging in one of the cabins on the property until Plaintiff began his employment with Stillpoint Lodge.

45. Plaintiff initially informed McLean that he planned to arrive in Homer around May 6, 2026, and would need lodging until approximately May 14, the day before his scheduled start date at Stillpoint Lodge.

46. Plaintiff ultimately informed McLean that he would arrive in Alaska on April 24, 2026, but intended to spend several days traveling before beginning work for her.

47. McLean again asked Plaintiff to begin the arrangement earlier and arranged to pick him up in Homer on April 27, 2026.

**D. Stillpoint Approves Plaintiff's Work-for-Lodging Arrangement**

48. On or about April 22, 2026, Plaintiff informed Stillpoint Lodge of his work-for-lodging arrangement with McLean and asked whether performing work at Between Beaches before his May 15 start date would violate the noncompetition provision of his employment agreement.

49. Cawvey, acting on behalf of Stillpoint Lodge, informed Plaintiff that the arrangement with McLean would not violate his employment agreement.

**E. Plaintiff Travels to Homer to Begin the Work-for-Lodging Arrangement**

50. Plaintiff arrived in Anchorage on April 24, 2026, and remained in communication with McLean concerning his anticipated arrival at Between Beaches.

51. Plaintiff and McLean agreed that Plaintiff would travel by bus from Anchorage to Homer with his luggage and approximately 250 pounds of personal belongings and equipment, where McLean would meet him and transport him by boat across Kachemak Bay to Between Beaches.

52. Before Plaintiff arrived, McLean offered Plaintiff the choice of staying in the Beach House, which had running water and indoor plumbing, or a dry cabin without running water and with an outhouse.

53. Plaintiff informed McLean that he selected the Beach House and intended to reside there for the duration of the parties' work-for-lodging arrangement.

54. On April 27, 2026, Plaintiff traveled by bus from Anchorage to Homer, arriving at approximately 7:00 p.m.

55. McLean met Plaintiff in Homer and took Plaintiff and his belongings with her.

56. McLean thereafter transported Plaintiff and his belongings by boat across Kachemak Bay to Between Beaches, where Plaintiff took up residence in the Beach House pursuant to the parties' agreement.

**F. Plaintiff Takes Possession of the Beach House and Performs Work for McLean**

57. Plaintiff and McLean arrived at Between Beaches on the evening of April 27, 2026.

58. Upon arrival, McLean showed Plaintiff the property and identified work and tasks she wanted Plaintiff to perform.

59. With McLean's permission, Plaintiff moved approximately 250 pounds of personal belongings and equipment into the Beach House. Plaintiff slept in

the Beach House and kept his clothing, food, medication, equipment, and other personal belongings there.

60. No other person stayed in the Beach House while Plaintiff stayed there.

61. From April 27 through May 3, 2026, Plaintiff performed substantial labor for McLean pursuant to the parties' work-for-lodging agreement. This included laundry, landscaping, hauling water, chopping and moving firewood, property maintenance, and other work necessary to prepare Between Beaches for the upcoming season.

62. Plaintiff frequently worked long days, at times exceeding ten hours, performing tasks assigned or directed by McLean.

63. After arriving at Between Beaches, Plaintiff discovered that substantially less food was available to him than McLean had represented before they traveled across Kachemak Bay.

64. Because Plaintiff was performing substantial physical labor and had limited food available to him, Plaintiff asked McLean on or about May 1, 2026, to transport him to Homer so that he could obtain additional food.

65. McLean agreed to transport Plaintiff to Homer on the condition that Plaintiff remain overnight and assist McLean by bringing her vehicle back from Homer on the ferry the following day.

66. McLean nevertheless informed Plaintiff that she would not transport him to Homer for at least two days.

**G. Defendant McLean Confronts Plaintiff about his HIV Medication.**

67. On or about April 29, 2026, while Plaintiff and McLean were speaking near the side-by-side vehicle on the beach, McLean told Plaintiff that she had seen his "pills."

68. McLean told Plaintiff that he needed to be careful because, if anyone at Stillpoint Lodge learned that Plaintiff was HIV positive, he would be fired.

69. Plaintiff was shocked and distressed by McLean's statements. Plaintiff had not disclosed his HIV status to McLean and had kept his HIV medication among his personal belongings inside the Beach House.

70. Plaintiff responded that it would be unlawful for Stillpoint Lodge to fire him because of his HIV status.

71. McLean responded, "this is Alaska, honey."

72. McLean continued to warn Plaintiff that he needed to remove or obscure the labels from his HIV medication or hide the medication after he arrived at Stillpoint Lodge because, if anyone there discovered his HIV status, he would lose his job.

73. Based upon the location where Plaintiff had stored his medication and McLean's knowledge of it, Plaintiff believed that McLean had accessed his personal belongings without his permission.

74. During the conversation, McLean returned to the Beach House and obtained a black marker, which she gave to Plaintiff while instructing him to obscure identifying information on his HIV medication.

75. McLean followed Plaintiff into the Beach House and insisted that Plaintiff obscure the identifying information on the medication bottle in her presence.

76. Plaintiff did not want to alter the prescription label and explained to McLean that he needed his medication to remain properly identified because he intended to travel with it.

77. Plaintiff regarded his HIV status as highly private and had disclosed it to very few people. He had not authorized McLean to access information concerning his HIV status or to disclose that information to others.

78. At the time, Plaintiff was residing at a remote property off the road system, had no personal transportation, and depended upon McLean or a water taxi to leave Between Beaches.

79. Under these circumstances, and in light of McLean's repeated warnings that disclosure of Plaintiff's HIV status could cause him to lose his anticipated employment at Stillpoint Lodge, Plaintiff felt pressured to comply with McLean's demand that he obscure the identifying information on his medication.

80. Under this pressure, Plaintiff used the marker provided by McLean to obscure his name and identifying information on one of the medication bottles.

**H. McLean Directs Plaintiff to Assist with the Studio Roof.**

81. In the late evening of May 1, 2026, Defendant asked Plaintiff to cover a roof of a Between Beaches art studio with tarps.

82. Defendant McLean had commissioned a contractor to build a roof on the studio during the same period of time when Plaintiff stayed at Between Beaches and performed under the work exchange agreement.

83. Defendant told Plaintiff the contractor left the roof in an unstable condition and open to rain, stating that it was going to cave in.

84. Defendant McLean insisted on Plaintiff's help covering the roof with a tarp.

85. Plaintiff informed Defendant McLean that he was uncomfortable because of her comments about the roof being unstable.

86. Plaintiff told Defendant McLean he did not want to climb on the unstable roof in the rain for fear of an injury that would impact his ability to perform his coming chef duties at Stillpoint Lodge.

87. Despite the safety concerns Plaintiff identified, Defendant insisted Plaintiff help cover the roof with tarps, stating that only the interior part of the roof was prone to caving in.

88. Plaintiff ultimately assisted McLean in covering the roof with tarps, continuing into the early morning hours of May 2, 2026.

**I. Plaintiff Travels to Homer and Transports McLean's Vehicle to Seldovia.**

89. On May 2, 2026, McLean transported Plaintiff from Between Beaches to Homer so that Plaintiff could obtain food and assist McLean with errands.

90. McLean had arranged for Plaintiff to remain overnight in Homer and transport her vehicle by ferry from Homer to Seldovia the following morning.

91. While in Homer, Plaintiff purchased groceries after having limited food available to him at Between Beaches.

92. Before McLean returned to Between Beaches that evening, Plaintiff asked if he could return with her rather than remain overnight in her vehicle.

93. McLean declined and left Plaintiff in Homer with the vehicle so that he could transport it to Seldovia the following morning.

94. Plaintiff remained in McLean's vehicle overnight and was unable to sleep.

95. On the morning of May 3, 2026, while waiting to board the ferry, Plaintiff communicated to McLean his frustration concerning the extensive hours he had worked, the limited food available to him, and the conditions of his overnight stay in the vehicle.

96. Plaintiff thereafter transported McLean's vehicle by ferry from Homer to Seldovia, arriving at approximately 1:30 p.m.

97. McLean met Plaintiff in Seldovia, and the two began traveling back toward Between Beaches.

98. During the return trip, McLean told Plaintiff that their arrangement was "not working out" and that Plaintiff needed to leave the following morning.

99. Plaintiff reminded McLean that they had an agreement permitting him to remain at Between Beaches until shortly before his employment at Stillpoint Lodge began and objected that less than one day's notice left him without sufficient time to secure alternative accommodations in the remote area.

100. Plaintiff expressed frustration concerning the extensive labor he had performed and the limited food available to him during the arrangement, but did not yell at or threaten McLean.

101. Plaintiff asked McLean if they could discuss the matter the following morning after he had eaten and rested. McLean responded, "we'll see."

**J. Defendant McLean Contacts VPSO Newhouse to Assist in Removing Plaintiff from Between Beaches.**

102. On May 3, 2026, McLean went to the Seldovia Police Department seeking assistance concerning Plaintiff.

103. Finding no one at the Police Department, McLean called 911 and told the dispatcher that she had an issue with someone on her property and stated, "I just need Dewey's phone number so that I can talk to him."

104. During the 911 call, McLean told the dispatcher, in substance, that Plaintiff had been "very promiscuous when he was younger," that he was "HIV positive," and that he "should have shared that with me before he came."

105. McLean's statements that Plaintiff had been promiscuous and that his HIV status resulted from promiscuous sexual conduct were false. Plaintiff had never told McLean that he was promiscuous or that he contracted HIV through promiscuous sexual conduct.

106. McLean further told the dispatcher that Plaintiff claimed "there are laws where I can't have him evicted," and responded, "I said I think I can."

107. During the same call, McLean told the dispatcher that Plaintiff "is hired to work at Stillpoint Lodge."

108. After the 911 call, McLean met with Village Public Safety Officer Dewey Newhouse ("Newhouse"), who responded to Between Beaches in his official capacity as a VPSO.

109. Before approaching Plaintiff, McLean showed Newhouse around the Between Beaches property and then led him to the Beach House where Plaintiff was residing.

**K. VPSO Newhouse Uses His Official Authority to Assist in Plaintiff's Removal**

110. On May 4, 2026, at approximately 10:15 a.m., McLean called Plaintiff and asked him to unlock the door to the Beach House.

111. Believing that McLean intended to continue their discussion concerning the work-for-lodging arrangement, Plaintiff opened the door and found McLean standing with Defendant Newhouse.

112. Newhouse was dressed in his VPSO uniform and equipped with his department-issued firearm, body-worn camera, and other law-enforcement equipment.

113. McLean introduced Newhouse to Plaintiff as an "officer" and her "friend."

114. McLean told Plaintiff that he had until approximately 12:10 p.m. to pack his belongings and leave the property.

115. Newhouse told Plaintiff, "she's done with you" and "you are leaving."

116. McLean and Newhouse entered the Beach House and continued directing Plaintiff to leave.

117. Newhouse repeatedly told Plaintiff that he could not remain at Between Beaches and that he would be required to leave notwithstanding Plaintiff's objections.

118. Plaintiff understood from Newhouse's uniform, firearm, presence, statements, and conduct that Newhouse was exercising official law-enforcement authority and that Plaintiff was not free to disregard his directions and remain in the residence.

### L. Newhouse Remains in the Residence While Plaintiff Attempts to Dress

119. Newhouse followed Plaintiff to the bedroom where Plaintiff had been sleeping and storing his personal belongings.

120. Plaintiff repeatedly asked Newhouse to leave the bedroom area so that Plaintiff could dress in private.

121. During the encounter, Newhouse placed his hand on or near his sidearm while looking at Plaintiff.


Case 3:26-cv-00307-SLG Document 1 Filed 08/26/26 Page 24 of 97

122. Plaintiff began recording the encounter with his cell phone because Newhouse refused to leave the bedroom to allow Plaintiff to change his clothing.

**M. Plaintiff Informs Newhouse of His Right to Occupy the Beach House**

123. Plaintiff showed Newhouse communications between Plaintiff and McLean concerning their work-for-lodging arrangement and explained that he had an agreement permitting him to reside at Between Beaches until shortly before beginning his employment at Stillpoint Lodge.

124. Plaintiff repeatedly objected that he could not lawfully be summarily removed from his residence without notice or lawful eviction process.

125. Newhouse nevertheless continued directing Plaintiff to leave the residence without a warrant, court order, writ of possession, eviction judgment, or other judicial process authorizing Plaintiff's removal.

126. Plaintiff asked Newhouse whether Plaintiff had committed a crime. Newhouse told Plaintiff that he had not.

127. Newhouse repeatedly acknowledged that the dispute between Plaintiff and McLean was a "civil matter."

128. Plaintiff asked Newhouse whether he would be arrested if he refused to leave. Newhouse responded that he would not.

129. Plaintiff then asked why Newhouse was directing him to leave if Plaintiff had committed no crime and the dispute was civil.

130. Newhouse responded that he was present because McLean had asked him to be there and had reported that Plaintiff was "violent."

131. Plaintiff denied having been violent and again questioned Newhouse about the basis for his law-enforcement involvement in a civil dispute.

132. Despite acknowledging that Plaintiff had committed no crime and that the dispute was civil, Newhouse continued to remain in the residence and direct Plaintiff to leave.

133. Plaintiff explained that he had no alternative accommodations and could not safely or reasonably relocate from the remote property on approximately two hours' notice.

134. McLean told Plaintiff that she would have him "drug out in handcuffs" and asked Newhouse to contact the Alaska State Troopers.

135. McLean thereafter called the Alaska State Troopers and requested that Plaintiff be arrested.

136. During the call, McLean handed her telephone to Newhouse, who spoke with the Troopers or dispatch concerning Plaintiff.

137. Newhouse characterized Plaintiff as "loud," "obnoxious," and "adamant," and stated that McLean did not feel safe with Plaintiff remaining at the property.

138. During the same communication, Newhouse acknowledged that "everything is calm right now."

139. When asked whether backup was needed, McLean responded that it was not.

**N. Plaintiff Complies with Newhouse's Direction and Leaves the Residence**

140. Plaintiff had no alternative accommodations arranged and had been given approximately two hours to pack his belongings and leave the remote property.

141. Plaintiff asked for additional time to secure alternative accommodations before being required to leave. McLean refused.

142. In light of Newhouse's armed and uniformed presence, his repeated directions that Plaintiff could not remain, McLean's threat that Plaintiff would be removed in handcuffs, and the continued involvement of law enforcement, Plaintiff believed that he had no meaningful choice but to comply.

143. Plaintiff began packing approximately 250 pounds of personal belongings and equipment that he had brought to Between Beaches.

144. Plaintiff was sufficiently fearful of the armed law-enforcement presence that, before retrieving his chef's knives from the kitchen as part of packing his belongings, Plaintiff told Newhouse where he was going and asked Newhouse not to shoot him.

145. Plaintiff repeatedly objected to being removed without lawful process but ultimately complied with Newhouse's directions and left the residence.

**O. McLean Threatens Plaintiff's Employment and Contacts Stillpoint Lodge**

146. During Plaintiff's removal from the Beach House, McLean discussed Plaintiff's accepted position as Commis Chef at Stillpoint Lodge and told Newhouse that Stillpoint would not want Plaintiff.

147. McLean discussed her relationship with individuals associated with Stillpoint Lodge, including owner JT Thurston, and work she was performing for the Lodge.

148. McLean told Plaintiff, "you are risking your job with Stillpoint. You don't think they are going to hear about this? It's a small bay!"

149. Shortly thereafter, and while Plaintiff was still packing his belongings, McLean placed a telephone call to JT Thurston at Stillpoint Lodge.

150. When the call was not answered, McLean left Thurston a voicemail asking him to return her call.

151. McLean continued discussing Plaintiff with Newhouse and stated, in substance, that Stillpoint would not tolerate Plaintiff's "volatile" personality.

**P. Stillpoint Lodge Terminates Plaintiff's Employment**

152. Before and after Plaintiff traveled to Alaska, Plaintiff remained in regular communication with Stillpoint Lodge concerning his accepted position as Commis Chef, including communications with Cawvey and Stillpoint's Head Chef, Matt.

153. After Plaintiff was removed from Between Beaches, Plaintiff informed Matt of the circumstances surrounding his removal and his resulting need for alternative housing.

154. Matt instructed Plaintiff to secure temporary housing in Homer and represented that Stillpoint Lodge would work to arrange housing for Plaintiff at the Lodge as soon as possible.

155. Following these communications, Stillpoint Lodge continued to treat Plaintiff's May 15 start date as proceeding as planned, and neither Cawvey nor Matt informed Plaintiff that his employment agreement or accepted offer of employment had been withdrawn or terminated.

156. On May 9, 2026, however, Cawvey informed Plaintiff by email that Stillpoint Lodge would no longer employ him for the 2026 season, stating:

> "This notice is to inform you that Stillpoint Lodge will not be moving forward with your employment for the 2026 season. Although you signed the 2026 Employment Agreement, the lodge management did not sign it because they are moving in a different direction. Consequently, your start date of May 15 is

canceled and you are no longer expected to report for duty as a Commis Chef."

157. Upon information and belief, between McLean's May 4, 2026 telephone call to Thurston and Stillpoint Lodge's May 9, 2026 termination of Plaintiff's accepted employment as Commis Chef, McLean communicated with Thurston and/or other representatives of Lodge concerning Plaintiff.

158. Upon information and belief, during those communications, McLean made negative statements concerning Plaintiff and disclosed Plaintiff's HIV status and/or information concerning Plaintiff's HIV status.

159. Upon information and belief, McLean's communications concerning Plaintiff were a factor in Stillpoint Lodge's subsequent decision not to employ Plaintiff for the 2026 season.

**Q. Plaintiff Suffers Substantial Economic and Noneconomic Harm**

160. As a result of the events alleged herein, Plaintiff lost his accepted position as a Commis Chef with Stillpoint Lodge and the compensation and employment benefits associated with that position.

161. Plaintiff was deprived of housing, transportation, and accepted employment in a remote area of Alaska and was required to obtain alternative lodging, transportation, necessities, and other accommodations on short notice.

162. Plaintiff incurred substantial expenses traveling to Alaska and transporting his personal belongings in reliance upon Stillpoint Lodge's accepted offer of employment and incurred additional expenses as a result of the abrupt termination of his housing and employment arrangements.

163. Plaintiff's removal from his residence, loss of employment with Stillpoint Lodge, and resulting displacement substantially disrupted his plans to obtain professional culinary experience and pursue his culinary career.

164. Plaintiff suffered severe emotional distress, humiliation, fear, anxiety, loss of dignity, and other noneconomic harm as a result of the events giving rise to this action.

165. Plaintiff suffered severe emotional distress, humiliation, fear, anxiety, and loss of dignity as a result of McLean's unauthorized access to information concerning Plaintiff's HIV status, her disclosure of Plaintiff's

HIV status and private information to others, her false and stigmatizing statements concerning Plaintiff's HIV status and sexual history, and her efforts to pressure Plaintiff to conceal identifying information on his prescription medication.

166. Plaintiff continues to experience emotional harm arising from McLean's invasion of his privacy, disclosure and misuse of his HIV status, discriminatory conduct, and interference with his accepted employment.

167. The events alleged herein have substantially disrupted Plaintiff's pursuit of a culinary career. Since these events, Plaintiff has not pursued further culinary employment because of continuing fear and anxiety concerning the potential disclosure of his HIV status, resulting discrimination, and interference with future employment opportunities.

168. Plaintiff has suffered and continues to suffer substantial economic and noneconomic damages in an amount to be determined at trial.

**R. Newhouse Prepares an Incident Report After Defendants Receive Notice of Anticipated Litigation.**

169. On May 11, 2026, Plaintiff, through counsel, provided Defendants written notice of anticipated litigation arising from the events alleged herein and requested preservation of evidence relating to those events.

170. On or about May 11, 2026, Plaintiff, through counsel, also submitted a public records request to the Alaska Department of Public Safety seeking records and recordings relating to Newhouse's involvement in Plaintiff's removal from Between Beaches.

171. At the time Defendants received notice of anticipated litigation and the preservation request, Newhouse had not prepared a written incident report documenting his involvement in Plaintiff's removal.

172. Newhouse subsequently prepared an incident report concerning the incident. The report reflects that Newhouse completed his narrative on May 16, 2026, after Defendants had received notice of anticipated litigation and the request to preserve evidence.

173. On May 21, 2026, the Department of Public Safety produced records responsive to Plaintiff's public records request, including Newhouse's approximately 2.2-hour body-worn-camera recording and incident report.

## V. CLAIMS FOR RELIEF

## COUNT I

**42 U.S.C. § 1983 — Unreasonable Seizure of Person in Violation of the Fourth Amendment**

(Plaintiff against Dewey Newhouse)

174. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

175. At all relevant times, Defendant Dewey Newhouse was acting under color of state law in his capacity as a Village Public Safety Officer.

176. Defendant Newhouse appeared and acted in his official capacity, including by wearing his VPSO uniform, carrying his holstered weapon, a body camera, and invoking or exercising his authority as a law-enforcement officer.

177. Through words, conduct, and his visible assertion of official authority, Defendant Newhouse directed, compelled, or otherwise caused Plaintiff to submit to Newhouse's authority and restricted Plaintiff's freedom to remain where he was or otherwise move freely.

178. Plaintiff submitted to Newhouse's assertion of official authority.

179. At the time of the seizure, Newhouse did not possess a warrant, court order, or other judicial authorization permitting him to seize or detain Plaintiff.

180. Newhouse lacked reasonable suspicion that Plaintiff had committed or was committing a crime and lacked probable cause to arrest Plaintiff.

181. No exigent circumstances or other lawful basis justified the seizure.

182. Newhouse's seizure of Plaintiff was therefore unreasonable and violated Plaintiff's rights under the Fourth Amendment to the United States Constitution.

183. Newhouse's conduct was a direct and proximate cause of Plaintiff's injuries and damages.

184. As a result, Plaintiff suffered economic and noneconomic damages, including emotional distress, humiliation, fear, loss of dignity, and other damages to be proven at trial.

185. Newhouse acted intentionally, maliciously, oppressively, and/or with reckless disregard for Plaintiff's federally protected rights, entitling Plaintiff to punitive damages to the extent permitted by law.

**COUNT II**
**42 U.S.C. § 1983 — Unreasonable Seizure of Plaintiff's Possessory Interest in Property in Violation of the Fourth Amendment**
(Plaintiff against Dewey Newhouse)

186. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

187. At all times relevant, Defendant Dewey Newhouse acted under color of state law in his capacity as a Village Public Safety Officer.

188. Plaintiff possessed a lawful possessory interest in lodging located at Between Beaches pursuant to his lodging-for-work agreement with Defendant McLean and his actual occupancy of the premises.

189. Plaintiff also possessed a lawful possessory interest in his personal belonging located within the Beach House.

190. Defendant Newhouse, acting under color of state law, exercised official authority to compel Plaintiff to surrender possession of the Beach House and other lodging on Between Beaches and leave the property.

191. Defendant Newhouse acted without a warrant, court order, writ of assistance, judgment of eviction, or other judicial authorization permitting Plaintiff's removal from the premises.

192. Defendant Newhouse's seizure of Plaintiff's possessory interest was objectively unreasonable under the Fourth Amendment.

193. Defendant Newhouse's conduct was the actual and proximate cause of Plaintiff's injuries or damages.

194. Plaintiff suffered the damages alleged above.

195. Defendant Newhouse acted intentionally, maliciously, oppressively, and/or with reckless disregard of Plaintiff's federally protected rights, entitling Plaintiff to Punitive Damages.

**COUNT III**
**42 U.S.C. § 1983 — Deprivation of Plaintiff's Property Interest Without Procedural Due Process in Violation of the Fourteenth Amendment**
(Plaintiff against Dewey Newhouse)

196. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

197. At all relevant times, Defendant Dewey Newhouse acted under color of state law in his capacity as a Village Public Safety Officer.

198. Plaintiff possessed a legitimate claim of entitlement to continued occupancy of the Beach House and other lodging facilities at Between Beaches pursuant to his lodging-for-work agreement with Defendant McLean and his actual possession of the premises.

199. Defendant Newhouse, acting under color of state law, deprived Plaintiff of that property interest by directing and assisting in Plaintiff's removal from the premises of Between Beaches.

200. Defendant Newhouse deprived Plaintiff of his possessory interest without notice, an opportunity to be heard, a judicial determination, an order of eviction, or any other constitutionally adequate process.

201. Defendant Newhouse's conduct deprived Plaintiff of procedural due process guaranteed by the Fourteenth Amendment.

202. Defendant Newhouse's conduct was the actual and proximate cause of Plaintiff's injuries and damages.

203. Plaintiff suffered the damages alleged above.

204. Defendant Newhouse acted intentionally, maliciously, oppressively, and/or with reckless disregard of Plaintiff's federally protected rights, entitling Plaintiff to punitive damages.

## COUNT IV

## 42 U.S.C. § 1983 – Civil Conspiracy to Deprive Plaintiff of Constitutional Rights

*(Plaintiff against Kristi McLean and Dewey Newhouse)*

205. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

206. At all times relevant to this Count, Defendant Newhouse acted under color of state law in his capacity as a Village Public Safety Officer.

207. Defendant McLean was a private actor who enlisted and/or sought the assistance of Newhouse to remove Plaintiff from his residence at Between Beaches.

208. As alleged herein, McLean and Newhouse communicated concerning Plaintiff and his removal from the residence before and during Newhouse's involvement in the dispute.

209. Upon information and belief, McLean and Newhouse reached an agreement, understanding, and/or meeting of the minds that Newhouse would use his official position and authority to assist, facilitate, and/or compel Plaintiff's removal from the residence.

210. McLean and Newhouse shared the common objective of removing Plaintiff from the residence through Newhouse's exercise of official authority despite the absence of a warrant, court order, writ of possession, eviction proceeding, or other judicial process authorizing Plaintiff's removal.

211. In furtherance of their agreement and common objective, McLean and Newhouse each committed overt acts to accomplish Plaintiff's removal, as alleged herein.

212. Newhouse invoked and/or exercised his official authority as a VPSO to direct, assist, facilitate, intimidate, and/or compel Plaintiff to leave the residence.

213. McLean requested, encouraged, participated in, and/or accepted Newhouse's exercise of official authority to accomplish Plaintiff's removal.

214. Through their agreement and joint conduct, McLean was a willful participant in joint action with Newhouse and acted under color of state law for purposes of 42 U.S.C. § 1983.

215. Defendants' conspiracy and joint action deprived Plaintiff of rights secured by the United States Constitution, including Plaintiff's Fourth Amendment right to be free from unreasonable seizures and Plaintiff's Fourteenth Amendment right not to be deprived of his property and possessory interests without due process of law, as more fully alleged in Plaintiff's preceding § 1983 claims.

216. Defendants' acts in furtherance of the conspiracy were a direct and proximate cause of the deprivation of Plaintiff's Fourth and Fourteenth Amendment rights and the resulting injuries.

217. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of housing and possessory interests, emotional distress, economic loss, and other damages in an amount to be determined at trial.

218. Defendants acted intentionally, maliciously, and/or with reckless or callous indifference to Plaintiff's federally protected rights, entitling Plaintiff to punitive damages against the individual Defendants to the extent permitted by law.

**COUNT V**
**Violation of Plaintiff's Right to Privacy Under Article 1, Section 22 of the Alaska Constitution**
(Plaintiff against Dewey Newhouse)

219. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

220. At all relevant times, Defendant Dewey Newhouse acted under color of state law in his capacity as a Village Public Safety Officer.

221. Article 1, Section 22 of the Alaska Constitution protects individuals against unjustified governmental intrusion into highly personal and confidential matters, including confidential medical information.

222. Plaintiff possessed a reasonable expectation of privacy in his HIV status and HIV-related medical information.

223. On information and belief, Defendant Newhouse became aware of Plaintiff's HIV status while acting in his official capacity as a Village Public Safety Officer.

224. Despite the highly confidential nature of Plaintiff's HIV status, Defendant Newhouse participated in governmental action affecting Plaintiff after learning and considering that confidential medical information.

225. Defendant Newhouse lacked a legitimate governmental need to obtain, use, or rely upon Plaintiff's confidential HIV-related medical information in carrying out his official duties.

226. Defendant Newhouse's conduct constituted an unreasonable governmental intrusion upon Plaintiff's constitutionally protected right to privacy under Article 1, Section 22 of the Alaska Constitution.

227. Defendant Newhouse's conduct was the actual and proximate cause of Plaintiff's injuries or damages.

228. Plaintiff suffered the damages alleged above.

**COUNT VI**
**Negligence**
(Plaintiff against VPSO Dewey Newhouse)

229. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

230. Defendant Newhouse responded to the dispute between Plaintiff and Defendant McLean in his official capacity as a Village Public Safety Officer and undertook to intervene in the dispute.

231. Having undertaken to intervene, Defendant Newhouse owed Plaintiff a duty to exercise reasonable care in the performance of his duties and in the exercise of his official authority.

232. Defendant Newhouse breached his duty of reasonable care by, among other things, using his official authority to direct, assist, facilitate, intimidate, and/or compel Plaintiff's removal from his residence without a warrant, court order, lawful eviction proceeding, or other lawful process authorizing Plaintiff's removal.

233. Defendant Newhouse knew or reasonably should have known that using his official authority to facilitate Plaintiff's removal without lawful process created a foreseeable risk of harm to Plaintiff.

234. Defendant Newhouse's acts and omissions were a direct and proximate cause of Plaintiff's removal from his residence and the resulting harm.

235. As a direct and proximate result of Defendant Newhouse's negligence, Plaintiff suffered economic loss, reputational harm, emotional distress, loss of housing and possessory interests, and other damages in an amount to be determined at trial.

236. Plaintiff is therefore entitled to recover all damages and other relief available under Alaska law.

**COUNT VII**
**Intentional Infliction of Emotional Distress**
(Plaintiff against VPSO Dewey Newhouse)

237. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

238. Defendant Newhouse intentionally and/or recklessly used the authority of his position as a Village Public Safety Officer to intimidate, coerce, and compel Plaintiff to leave his residence despite the absence of a warrant, court order, eviction proceeding, or other lawful process authorizing Plaintiff's removal.

239. Defendant Newhouse knew or recklessly disregarded the substantial probability that using his official authority to compel Plaintiff from his residence under the circumstances alleged herein would cause Plaintiff severe emotional distress.

240. Defendant Newhouse's conduct, including his misuse of governmental authority to facilitate Plaintiff's extrajudicial removal from his residence, was extreme and outrageous and exceeded the bounds of conduct reasonably tolerated in a civilized society.

241. Defendant Newhouse's intentional and/or reckless conduct caused Plaintiff severe emotional distress.

242. As a direct and proximate result of Defendant Newhouse's conduct, Plaintiff suffered severe emotional distress, humiliation, fear, anxiety, loss of security, reputational harm, and other damages in an amount to be determined at trial.

243. Defendant Newhouse's conduct was intentional, malicious, oppressive, and/or undertaken with reckless disregard for Plaintiff's rights, entitling Plaintiff to punitive damages to the extent permitted by law.

**COUNT VIII**
**Monell / Entity Liability Under § 1983**

(Plaintiff against City of Seldovia and Aleutian Pribilof Islands Association)

244. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

245. At all times relevant to this action, Defendant Newhouse acted under color of state law while performing law-enforcement and public safety functions as a Village Public Safety Officer assigned to serve Seldovia, Alaska.

246. Pursuant to the City–APIA Memorandum of Agreement and the operational arrangements alleged above, the City and APIA each exercised certain responsibilities concerning the assignment, provision, administration, oversight, and operation of VPSO services in Seldovia. The precise allocation of those responsibilities is contained in agreements, policies, and program records presently within Defendants' possession and control.

247. Upon information and belief, the City and APIA maintained policies, customs, or practices—or failed to establish appropriate policies and supervisory procedures—concerning VPSO intervention in private

property disputes, removal of occupants from residences, and the use of law-enforcement authority in civil disputes.

248. Upon information and belief, APIA failed to provide or ensure adequate training and supervision concerning the circumstances under which a VPSO may use official authority to remove or assist in removing an occupant from a residence without a warrant, court order, eviction proceeding, or other lawful process.

249. The need for appropriate policies, procedures, training, and supervision concerning the use of law-enforcement authority to interfere with an individual's residence and possessory interests was obvious. The failure to provide such policies, procedures, training, and supervision created a substantial risk that VPSOs would violate the constitutional rights of persons with whom they interacted.

250. Upon information and belief, the foregoing failures amounted to deliberate indifference to the constitutional rights of persons with whom VPSOs would foreseeably interact.

251. As alleged herein, Newhouse used his official authority to direct, facilitate, assist in, and/or compel Plaintiff's removal from his residence

without a warrant, court order, lawful eviction proceeding, or other lawful process.

252. The policies, customs, practices, and deliberately indifferent failures alleged above were a moving force behind Newhouse's violations of Plaintiff's rights under the Fourth and Fourteenth Amendments.

253. As a direct and proximate result of these constitutional violations, Plaintiff suffered the injuries and damages alleged herein.

254. Defendants City of Seldovia and APIA are therefore liable under 42 U.S.C. § 1983 for the constitutional deprivations caused by their respective policies, customs, practices, and deliberately indifferent omissions.

**COUNT IX**
**Negligent Training and Supervision.**
(Plaintiff against Aleutian Pribilof Islands Association and City of Seldovia)

255. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

256. At all relevant times, APIA was the regional VPSO program grantee serving Seldovia and Newhouse's employer. As Newhouse's employer and regional program administrator, APIA was responsible for supervising his

work, providing or arranging employer-level training, and ensuring his compliance with applicable statewide and regional training requirements.

257. The City of Seldovia entered into a Memorandum of Agreement with APIA concerning the employment and provision of Village Public Safety Officers serving the Seldovia community, including Newhouse.

258. Upon information and belief, the City–APIA Memorandum of Agreement assigned the City certain responsibilities concerning the oversight or operation of VPSO services in Seldovia. The precise nature and extent of those responsibilities are contained in the agreement and related records presently within Defendants' possession and control.

259. APIA knew or reasonably should have known that Newhouse would encounter private housing and property disputes, including requests by private persons for law-enforcement assistance in removing occupants from residences.

260. APIA owed a duty to exercise reasonable care in training and supervising Newhouse concerning the lawful scope of his VPSO authority when responding to such disputes, including the constitutional and legal

limitations on using official authority to remove an occupant without a warrant, court order, lawful eviction proceeding, or other lawful process.

261. Upon information and belief, the City assumed certain responsibilities under the City–APIA Memorandum of Agreement for supervising Newhouse or establishing operational policies governing his response to such disputes. The City therefore owed a duty to exercise reasonable care in performing those responsibilities.

262. Upon information and belief, APIA failed to exercise reasonable care in training and supervising Newhouse concerning the lawful scope of his authority when responding to private housing and property disputes.

263. Upon information and belief, the City possessed relevant supervisory or operational responsibilities under the City–APIA Memorandum of Agreement and failed to exercise reasonable care in carrying out those responsibilities.

264. As alleged herein, Newhouse used his official authority to direct, assist, facilitate, intimidate, and/or compel Plaintiff's removal from his residence without a warrant, court order, lawful eviction proceeding, or other lawful process authorizing Plaintiff's removal.

265. Adequate training and supervision concerning the limits of Newhouse's authority when responding to private housing and property disputes would have prevented or reduced the likelihood of the conduct alleged herein.

266. Defendants' respective failures to exercise reasonable care in carrying out their training, supervisory, and operational responsibilities were direct and proximate causes of Newhouse's conduct and Plaintiff's resulting injuries and damages.

267. As a direct and proximate result, Plaintiff suffered the injuries and damages alleged herein.

**COUNT X**
**Vicarious Liability / Respondeat Superior**
(Plaintiff against Aleutian Pribilof Islands Association)

268. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

269. At all relevant times, APIA employed Newhouse as a VPSO and assigned him to provide law-enforcement and public-safety services in the Seldovia area.

270. Newhouse responded to McLean's request for law-enforcement assistance and engaged in the conduct alleged herein while performing or purporting to perform his assigned VPSO duties and within the course and scope of his employment with APIA.

271. APIA is therefore vicariously liable under Alaska law for Newhouse's tortious conduct alleged in Counts VI and VII to the extent that such conduct occurred within the course and scope of his employment.

**COUNT XI**
**Common-Law Invasion of Plaintiff's Privacy–Intrusion Upon Seclusion**
(Plaintiff against Kristi McLean)

272. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

273. Defendant McLean intentionally intruded upon Plaintiff's solitude, seclusion, and private affairs and concerns.

274. Plaintiff had a reasonable expectation of privacy in his confidential personal and medical information, including information concerning his HIV status and medical treatment for HIV.

275. Defendant McLean intentionally obtained, accessed, investigated, or otherwise intruded upon Plaintiff's confidential medical information without Plaintiff's knowledge, authorization, or consent.

276. Defendant McLean's intrusion concerned matters that Plaintiff had kept private and had not voluntarily disclosed to McLean.

277. Under the circumstances alleged herein, Defendant McLean's intrusion into Plaintiff's private affairs would be highly offensive to a reasonable person.

278. As a direct and proximate result of Defendant McLean's conduct, Plaintiff suffered damages, including emotional distress, humiliation, discrimination, embarrassment, and loss of privacy.

279. Defendant McLean's conduct was intentional, malicious, oppressive and/or undertaken with reckless indifference to Plaintiff's rights, entitling Plaintiff to punitive damages to the extent permitted by law.

**COUNT XII**

**Common-Law Invasion of Privacy –Public Disclosure of Plaintiff's Private Facts**

(Plaintiff against Kristi McLean)

280. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

281. Plaintiff's HIV status and related medical information constituted private and confidential facts concerning Plaintiff's personal life and health.

282. Plaintiff did not consent to Defendant McLean's disclosure of his HIV status or other confidential information to third parties.

283. Defendant McLean intentionally disclosed Plaintiff's private and confidential medical information, including his HIV status, to third parties without Plaintiff's knowledge, authorization, or consent.

284. The information disclosed by Defendant McLean was not a matter of legitimate public concern.

285. The disclosure of Plaintiff's HIV status and confidential medical information under the circumstances alleged herein would be highly offensive to a reasonable person.

286. As a direct and proximate result of Defendant McLean's conduct, Plaintiff suffered damages, including emotional distress, humiliation,

embarrassment, loss of privacy, reputational harm, and other damages in an amount to be determined at trial.

287. Defendant McLean's conduct was intentional, malicious, oppressive and/or undertaken with reckless indifference to Plaintiff's rights, entitling Plaintiff to punitive damages to the extent permitted by law.

**COUNT XIII**

***Defamation Per Se***

*(Plaintiff against Kristi McLean)*

288. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

289. During her May 4, 2026 call to 911, Defendant McLean communicated statements concerning Plaintiff to the 911 operator.

290. During the call, McLean stated, in substance, that Plaintiff was promiscuous and that Plaintiff contracted HIV as a result of his promiscuity.

291. McLean's statements concerning Plaintiff's alleged promiscuity and the manner in which Plaintiff contracted HIV were false.

292. Plaintiff did not contract HIV as a result of promiscuous sexual conduct.

293. Plaintiff had never told McLean that he was promiscuous or that he contracted HIV as a result of promiscuous sexual conduct, and McLean lacked a reasonable factual basis for making those statements.

294. McLean knew that her statements concerning Plaintiff's alleged promiscuity and the circumstances under which he contracted HIV were false and/or failed to exercise reasonable care to determine whether those statements were true before communicating them to others.

295. McLean published the false statements concerning Plaintiff's alleged promiscuity and the circumstances under which he contracted HIV to the 911 operator, a person other than Plaintiff.

296. As alleged herein, McLean also threatened that Stillpoint Lodge would "hear about" Plaintiff, represented that Plaintiff's anticipated employment with Stillpoint Lodge would be jeopardized, and communicated with JT Thurston and/or other representatives of Stillpoint Lodge concerning Plaintiff during and following the dispute between McLean and Plaintiff.

297. Upon information and belief, McLean communicated false and defamatory statements concerning Plaintiff's sexual conduct and/or the

circumstances under which Plaintiff contracted HIV to additional third parties, including individuals associated with Stillpoint Lodge.

298. Plaintiff's information and belief is based, among other things, upon McLean's unsolicited disclosure of Plaintiff's HIV status and alleged sexual conduct during the 911 call; McLean's statements that Stillpoint Lodge would "hear about" Plaintiff; McLean's contemporaneous communications with Stillpoint Lodge; and Stillpoint Lodge's subsequent decision not to employ Plaintiff as previously anticipated.

299. McLean's false statements concerning Plaintiff's alleged promiscuity and sexual conduct were defamatory because they tended to harm Plaintiff's reputation, lower Plaintiff in the estimation of others, and/or deter others from associating or dealing with Plaintiff.

300. McLean's false statements imputed serious sexual misconduct to Plaintiff and constituted defamation per se.

301. As a direct and proximate result of McLean's defamatory statements, Plaintiff suffered reputational harm, humiliation, embarrassment, emotional distress, economic harm, and other damages in an amount to be determined at trial.

302. Because McLean's statements were defamatory per se, Plaintiff is not required to establish special harm to recover damages available under Alaska law.

303. McLean's conduct was intentional, malicious, and/or undertaken with reckless disregard for Plaintiff's rights, entitling Plaintiff to punitive damages to the extent permitted by Alaska law.

**COUNT XIV**
***Common Law Invasion of Privacy — False Light***
*(Plaintiff against Kristi McLean)*

304. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

305. During her May 4, 2026 call to 911, Defendant McLean disclosed Plaintiff's HIV status and stated, in substance, that Plaintiff was promiscuous and had contracted HIV as a result of his promiscuity.

306. McLean's statements concerning Plaintiff's alleged promiscuity and the circumstances under which Plaintiff contracted HIV were false.

307. Through these statements, McLean falsely portrayed Plaintiff as sexually promiscuous and falsely attributed Plaintiff's HIV status to promiscuous sexual conduct.

308. As alleged herein, McLean also threatened that Stillpoint Lodge would "hear about" Plaintiff and thereafter communicated with JT Thurston and/or other representatives of Stillpoint Lodge concerning Plaintiff.

309. Upon information and belief, McLean communicated the same or substantially similar false information concerning Plaintiff's sexual conduct and/or the circumstances under which Plaintiff contracted HIV to additional third parties, including individuals associated with Stillpoint Lodge.

310. Upon information and belief, McLean gave publicity to false matters concerning Plaintiff that placed Plaintiff before others in a false light.

311. The false light in which McLean placed Plaintiff would be highly offensive to a reasonable person.

312. McLean knew that her statements and the resulting portrayal of Plaintiff were false and/or acted with reckless disregard as to the falsity of the statements and the false light in which Plaintiff would be placed.

313. As a direct and proximate result of McLean's conduct, Plaintiff suffered humiliation, embarrassment, emotional distress, reputational

harm, economic harm, and other damages in an amount to be determined at trial.

314. McLean's conduct was intentional, malicious, and/or undertaken with reckless disregard for Plaintiff's rights, entitling Plaintiff to punitive damages to the extent permitted by Alaska law.

**COUNT XV**
***Intentional Infliction of Emotional Distress***
*(Plaintiff against Kristi McLean)*

315. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

316. As alleged herein, McLean engaged in a course of conduct toward Plaintiff that included intruding into Plaintiff's private medical affairs; making false and stigmatizing statements concerning Plaintiff's sexual conduct and the manner in which he contracted HIV; unnecessarily disclosing Plaintiff's HIV status and private medical information to third parties; threatening to interfere with Plaintiff's anticipated employment with Stillpoint Lodge; abruptly terminating Plaintiff's housing arrangement; and enlisting an armed and uniformed Village Public Safety Officer to assist in compelling Plaintiff's removal from his residence.

317. McLean's conduct, considered individually and cumulatively, was extreme and outrageous and exceeded the bounds of conduct tolerated in a civilized society.

318. McLean intended to cause Plaintiff emotional distress and/or acted with reckless disregard of the probability that her conduct would cause Plaintiff emotional distress.

319. McLean's conduct caused Plaintiff to experience severe emotional distress.

320. As a direct and proximate result of McLean's conduct, Plaintiff suffered severe emotional distress, humiliation, embarrassment, anxiety, loss of dignity, and other injuries and damages in an amount to be determined at trial.

321. McLean's conduct was outrageous, including acts performed with malice or bad motives and/or with reckless indifference to Plaintiff's interests, entitling Plaintiff to punitive damages to the extent permitted under Alaska law.

## COUNT XVI

***Breach of Contract***

*(Plaintiff against Kristi McLean individually and Kristi McLean d/b/a Between Beaches Alaska)*

322. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

323. Plaintiff and Defendant McLean entered into an agreement whereby Plaintiff agreed to perform labor and services for McLean and Between Beaches Alaska in exchange for lodging and dining at Between Beaches until Plaintiff was scheduled to begin his employment at Stillpoint Lodge.

324. The parties agreed that Plaintiff would perform work for McLean in exchange for lodging through approximately May 14, 2026, immediately before Plaintiff's scheduled May 15, 2026, start date at Stillpoint Lodge.

325. Plaintiff and McLean mutually assented to the material terms of the agreement, and Plaintiff's promise to perform labor and services constituted consideration for McLean's promise to provide lodging and dining.

326. Plaintiff performed and/or substantially performed his obligations under the agreement by performing substantial labor and services for McLean and Between Beaches.

327. To the extent Plaintiff did not complete performance through the agreed-upon term, his performance was excused because McLean

terminated the agreement, required Plaintiff to leave Between Beaches, and prevented Plaintiff from completing his remaining performance.

328. On May 3, 2026, McLean informed Plaintiff that she was terminating the parties' agreement and required Plaintiff to leave Between Beaches the following morning.

329. On May 4, 2026, before expiration of the agreed-upon lodging period, McLean required Plaintiff to vacate Between Beaches and enlisted Defendant Newhouse, acting in his official capacity as VPSO, to assist in compelling Plaintiff's removal.

330. By terminating Plaintiff's lodging before the agreed-upon date and depriving plaintiff of the lodging promised in exchange for his labor and services, McLean materially breached the parties' agreement.

331. McLean's breach caused Plaintiff to lose the benefit of the parties' bargain and caused Plaintiff to incur additional expenses and other losses resulting from the premature termination of his lodging and dining.

332. As a direct and proximate result of McLean's breach, Plaintiff suffered damages in an amount to be determined at trial.

## COUNT XVII
### *Breach of the Implied Covenant of Good Faith and Fair Dealing*

*(Plaintiff against Kristi McLean, individually, and Kristi McLean d/b/a Between Beaches Alaska)*

333. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

334. The lodging-for-work agreement between Plaintiff and Defendant McLean contained an implied covenant of good faith and fair dealing.

335. Under the parties' agreement, Plaintiff was entitled to receive lodging and dining at Between Beaches in exchange for the labor and services he agreed to perform for McLean.

336. Plaintiff performed and/or substantially performed his obligations under the agreement, and any further performance was excused or prevented by McLean's termination of the agreement and removal of Plaintiff from Between Beaches.

337. After accepting the benefit of Plaintiff's labor and services, McLean intentionally deprived Plaintiff of the benefit of the parties' agreement by terminating his lodging before the agreed-upon date and requiring him to leave Between Beaches.

338. Alternatively, and/or additionally, McLean deprived Plaintiff of the parties' agreement by acting in a manner that a reasonable person would

regard as unfair, including by accepting Plaintiff's substantial labor and services and thereafter requiring him to leave the remote property on less than one day's notice without reasonable opportunity to secure alternative lodging or transportation.

339. McLean further acted unfairly by enlisting an armed uniformed Village Public Safety Officer to assist in compelling Plaintiff's removal after Plaintiff asserted his right to remain pursuant to the parties' agreement.

340. McLean's conduct intentionally deprived Plaintiff of the benefits reasonably contemplated by the parties' agreement and/or constituted conduct that a reasonable person would regard as unfair.

341. McLean thereby breached the implied covenant of good faith and fair dealing.

342. As a direct and proximate result of McLean's breach, Plaintiff suffered damages in an amount to be determined at trial.

**COUNT XVIII**

***Unlawful Ouster in Violation of AS 34.03.210***

*(Plaintiff against Kristi McLean, individually, and Kristi McLean d/b/a Between Beaches Alaska)*

343. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

344. Plaintiff and Defendant McLean entered into an agreement pursuant to which Plaintiff was entitled to occupy lodging at Between Beaches through approximately May 14, 2026, in exchange for labor and services performed for McLean.

345. Plaintiff took possession of the Beach House with McLean's consent, stored his personal belongings there, slept there, and used the Beach House as his residence while performing under the parties' agreement.

346. To the extent the Alaska Uniform Residential Landlord and Tenant Act ("URLTA") applies to the parties' lodging arrangement, Plaintiff was a tenant, McLean was a landlord, and the Beach House and other lodging facilities at Between Beaches offered for Plaintiff's use constituted a dwelling unit and premises within the meaning of AS 34.03.360.

347. Plaintiff had not voluntarily surrendered or abandoned possession of the Beach House and maintained a contractual and possessory right to occupy the premises at the time of the events alleged herein.

348. On May 3, 2026, McLean informed Plaintiff that he was required to leave the premises the following morning, before expiration of the agreed-upon period of occupancy.

349. On May 4, 2026, McLean demanded that Plaintiff immediately vacate the premises and enlisted an armed and uniformed Village Public Safety Officer to assist in compelling Plaintiff's removal.

350. McLean did not obtain a judgment for possession, writ of assistance, court order, or other judicial process authorizing Plaintiff's removal from the premises.

351. Through the conduct alleged herein, McLean removed and/or excluded Plaintiff from the premises without lawful process and thereby unlawfully ousted Plaintiff from his residence.

352. To the extent the Alaska URLTA governs Plaintiff's occupancy, McLean's removal and exclusion of Plaintiff constituted an unlawful ouster in violation of AS 34.03.210.

353. As a direct and proximate result of McLean's unlawful conduct, Plaintiff suffered actual damages, including loss of housing, costs associated with obtaining alternative lodging and transportation, economic loss, emotional distress, and other damages in an amount to be determined at trial.

354. Plaintiff is entitled to the remedies provided by AS 34.03.210 and all other relief available under Alaska Law.

**COUNT XIX**

***Breach of the Implied Covenant of Quiet Enjoyment***

*(Plaintiff against Kristi McLean, individually, and Kristi McLean d/b/a Between Beaches Alaska)*

355. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

356. Plaintiff and Defendant McLean entered into an agreement pursuant to which Plaintiff was entitled to occupy the Beach House and other lodging options at Between Beaches through approximately May 14, 2026, in exchange for labor and services performed for McLean.

357. Plaintiff took possession of the Beach House with McLean's consent, resided in the Beach House, stored his personal belongings there, and performed substantial labor and services pursuant to the parties' agreement.

358. Plaintiff's right to occupy the Beach House included an implied covenant that McLean would not substantially interfere with Plaintiff's use and enjoyment of the premises during the agreed-upon period of occupancy.

359. On May 3, 2026, before the expiration of the agreed-upon period of occupancy, McLean informed Plaintiff that he was required to leave Between Beaches the following morning.

360. On May 4, 2026, McLean entered and/or caused others to enter Plaintiff's living space and enlisted Defendant Newhouse, an armed and uniformed Village Public Safety Officer, to assist in compelling Plaintiff to leave the premises.

361. McLean substantially interfered with Plaintiff's use and enjoyment of the premises by demanding his immediate departure, entering his living space during the removal, threatening that he would be removed in handcuffs, and using the presence and authority of law enforcement to compel Plaintiff to surrender possession.

362. McLean's conduct substantially disturbed and ultimately deprived Plaintiff of his use and enjoyment of the premises before expiration of the parties' agreed-upon period of occupancy.

363. McLean thereby breached the implied covenant of quiet enjoyment.

364. As a direct and proximate result of McLean's breach, Plaintiff suffered damages, including loss of the use and enjoyment of the premises,

alternative lodging and transportation expenses, economic loss, and other damages in an amount to be determined at trial.

**COUNT XX**

***Unjust Enrichment / Restitution Based on Implied Contract***

*(Plaintiff against Kristi McLean, individually, and Kristi McLean d/b/a Between Beaches Alaska)*

365. Plaintiff incorporates by reference the preceding paragraphs as though fully set forth herein.

366. Plaintiff pleads this claim in the alternative to his claim for breach of contract pursuant to Fed. R. Civ. P. 8(d).

367. Plaintiff performed substantial labor and services for Defendant McLean and Between Beaches Alaska, including landscaping, hauling water, cutting and hauling wood, laundry, pumping and hauling water, property maintenance, assisting with the protection of McLean's construction project, and other work performed at McLean's direction.

368. Plaintiff's labor and services conferred a financial and economic benefit upon McLean and Between Beaches Alaska.

369. McLean knew that Plaintiff was performing the labor and services for her benefit, directed and accepted Plaintiff's performance, and realized and accepted the resulting benefit.

370. Plaintiff performed the labor and services with the understanding that he would receive lodging at Between Beaches through approximately May 14, 2026, in exchange for his performance.

371. After accepting the benefit of Plaintiff's substantial labor and services, McLean terminated Plaintiff's occupancy before the agreed-upon date and deprived Plaintiff of the full consideration he expected to receive in exchange for his performance.

372. To the extent the parties' express lodging-for-work agreement is determined to be unenforceable or otherwise does not provide Plaintiff a contractual remedy, it would be inequitable and unjust to permit Mclean to retain the benefit of Plaintiff's labor and services without compensating Plaintiff for their reasonable value.

373. Plaintiff is therefore entitled to restitution in an amount equal to the reasonable value of the benefit conferred upon and retained by McLean, less the value of any consideration Plaintiff actually received, in an amount to be determined at trial.

## COUNT XXI

### *Wage-and-Hour Claims*

*(Plaintiff against Kristi McLean / Kristi McLean d/b/a Between Beaches Alaska)*

374. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

375. Plaintiff performed substantial labor and services for Defendant McLean and Between Beaches Alaska, including landscaping, hauling water, cutting and hauling wood, laundry, property maintenance, and other work performed at McLean's direction and for her benefit.

376. Upon information and belief, Plaintiff was an employee within the meaning of the Alaska Wage and Hour Act, AS 23.10.050–23.10.150, and Defendant McLean was Plaintiff's employer within the meaning of the Act.

377. Defendant McLean failed to compensate Plaintiff for all hours worked at the minimum wage required by Alaska law.

378. To the extent applicable, Defendant McLean further failed to comply with Alaska law governing the payment of wages owed to Plaintiff.

379. As a direct result of Defendant McLean's failure to pay Plaintiff the wages required by law, Plaintiff suffered damages, including unpaid wages and other economic losses

380. As a result of Defendant McLean's violations, Plaintiff is entitled to recover unpaid wages, liquidated damages, attorney's fees and costs, and all other relief available under Alaska law, including AS 23.10.110.

## COUNT XXII

***Alaska Human Rights Act — Housing Discrimination***

*(Plaintiff against Kristi McLean, individually and d/b/a Between Beaches Alaska)*

381. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

382. At all times relevant to this action, Defendant McLean owned, managed, controlled, and/or possessed the right to lease or rent the real property at Between Beaches within the meaning of AS 18.80.240.

383. Plaintiff occupied the Beach House at Between Beaches pursuant to an agreement with McLean under which Plaintiff provided labor and services as consideration for the right to use, occupy, lease, and/or rent the Beach House through approximately May 14, 2026.

384. Plaintiff is an individual with a physical disability protected by the Alaska Human Rights Act.

385. McLean became aware of Plaintiff's disability during Plaintiff's occupancy of the Beach House.

386. After learning of Plaintiff's disability, McLean discriminated against Plaintiff in the terms, conditions, and/or privileges relating to Plaintiff's use, occupancy, lease, and/or rental of the Beach House or any other lodging at Between Beaches.

387. McLean's discriminatory conduct included terminating Plaintiff's occupancy before the agreed-upon date and requiring Plaintiff to leave the property.

388. Plaintiff's disability was a motivating factor in McLean's decision to discriminate against Plaintiff in the terms, conditions, and/or privileges of his use and occupancy of the property and/or to terminate his occupancy.

389. McLean's conduct constituted unlawful discrimination in violation of AS 18.80.240.

390. As a direct and proximate result of McLean's unlawful discrimination, Plaintiff suffered economic loss, loss of housing, emotional distress, humiliation, and other damages in an amount to be determined at trial.

391. Plaintiff is entitled to all damages and other relief available under the Alaska Human Rights Act.

**COUNT XXIII**
**Violation of the Fair Housing Act**
42 U.S.C. §§ 3604(f)(1), 3604(f)(2), and 3617
*(Plaintiff against Kristi McLean, individually and d/b/a Between Beaches Alaska)*

392. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

393. At all times relevant to this action, Plaintiff occupied the Beach House at Between Beaches as his residence pursuant to an agreement with McLean under which Plaintiff provided labor and services in exchange for the right to use and occupy the dwelling.

394. The Beach House constituted a "dwelling" within the meaning of the Fair Housing Act.

395. Plaintiff is an individual with a disability within the meaning of the Fair Housing Act.

396. McLean became aware of Plaintiff's disability during Plaintiff's occupancy of the Beach House.

**A. Discriminatory Housing Practices — 42 U.S.C. §§ 3604(f)(1) and (f)(2)**

397. The Fair Housing Act prohibits discrimination in the rental of, or otherwise making unavailable or denying, a dwelling because of a person's disability.

398. The Fair Housing Act further prohibits discrimination in the terms, conditions, or privileges of the rental of a dwelling, or in the provision of services or facilities in connection with the dwelling, because of disability.

399. After learning of Plaintiff's disability, McLean subjected Plaintiff to discriminatory treatment concerning his continued use and occupancy of the Beach House.

400. As alleged herein, McLean made stigmatizing statements concerning Plaintiff's disability, falsely attributed Plaintiff's HIV status to promiscuous sexual conduct, and thereafter terminated Plaintiff's right to occupy the Beach House before the agreed-upon termination date.

401. McLean caused and/or participated in Plaintiff's removal from the Beach House and thereby denied and/or made the dwelling unavailable to Plaintiff.

402. Plaintiff's disability was a motivating factor in McLean's discriminatory treatment of Plaintiff and her decision to terminate Plaintiff's housing and cause his removal from the Beach House.

403. McLean thereby discriminated against Plaintiff in the terms, conditions, and/or privileges of his housing and made the dwelling unavailable to Plaintiff because of his disability, in violation of 42 U.S.C. §§ 3604(f)(1) and 3604(f)(2).

**B. Coercion, Intimidation, Threats, or Interference — 42 U.S.C. § 3617**

404. Section 3617 of the Fair Housing Act prohibits coercing, intimidating, threatening, or interfering with a person in the exercise or enjoyment of rights protected by the Fair Housing Act.

405. As alleged herein, McLean threatened, intimidated, coerced, and/or interfered with Plaintiff in connection with his use and enjoyment of the Beach House.

406. McLean enlisted Defendant Newhouse, an armed and uniformed Village Public Safety Officer acting under color of law, to assist in

compelling Plaintiff to leave the Beach House without a court order or other lawful eviction process.

407. McLean's conduct interfered with Plaintiff's exercise and enjoyment of rights protected by the Fair Housing Act and was motivated, at least in part, by Plaintiff's disability.

408. McLean's conduct violated 42 U.S.C. § 3617.

409. As a direct and proximate result of McLean's violations of the Fair Housing Act, Plaintiff suffered loss of housing, economic damages, emotional distress, humiliation, embarrassment, loss of dignity, and other damages in an amount to be determined at trial.

410. McLean's conduct was intentional and/or undertaken with reckless disregard for Plaintiff's federally protected rights, entitling Plaintiff to all compensatory and punitive damages and other relief available under the Fair Housing Act.

**COUNT XXIV**

***Intentional Interference with Contract***

*(Plaintiff against Kristi McLean )*

411. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

412. Plaintiff entered into an employment agreement with Stillpoint Lodge pursuant to which Plaintiff was scheduled to begin employment as a seasonal chef on May 15, 2026.

413. Defendant McLean knew of Plaintiff's employment agreement with Stillpoint Lodge and knew that Plaintiff intended to begin working for Stillpoint Lodge immediately following the conclusion of his lodging arrangement with McLean.

414. McLean knew of Plaintiff's employment agreement because, among other things, Plaintiff informed McLean of his anticipated employment with Stillpoint Lodge and the parties structured Plaintiff's lodging arrangement around Plaintiff's May 15, 2026 employment start date.

415. McLean also had a preexisting relationship with Stillpoint Lodge and its management and represented to Plaintiff that she knew individuals associated with Stillpoint Lodge.

416. During the events leading to Plaintiff's removal from Between Beaches, McLean threatened to contact Stillpoint Lodge concerning Plaintiff and represented that Plaintiff's conduct would jeopardize his anticipated employment.

417. McLean thereafter contacted and/or communicated with Stillpoint Lodge concerning Plaintiff.

418. Upon information and belief, McLean intentionally communicated information concerning Plaintiff to Stillpoint Lodge for the purpose of interfering with and/or causing the termination of Plaintiff's employment relationship with Stillpoint Lodge.

419. Shortly thereafter, Stillpoint Lodge terminated and/or repudiated its employment agreement with Plaintiff before Plaintiff's scheduled May 15, 2026 start date.

420. McLean's communications and conduct were a substantial factor in causing Stillpoint Lodge to terminate and/or breach its employment agreement with Plaintiff.

421. McLean's interference was not privileged or justified and was undertaken for an improper purpose.

422. As a direct and proximate result of McLean's intentional interference, Plaintiff lost the benefits of his employment agreement with Stillpoint Lodge and suffered lost wages, lost employment opportunities,

consequential economic losses, and other damages in an amount to be determined at trial.

423. Plaintiff is entitled to recover all damages and other relief available under Alaska law.

**COUNT XXV**

***Intentional Interference with Prospective Economic Advantage***

*(Plaintiff against Kristi McLean )*

424. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

425. Plaintiff pleads this claim in the alternative to his claim for Tortious Interference with Contract pursuant to Federal Rule of Civil Procedure 8(d).

426. To the extent Plaintiff's employment agreement with Stillpoint Lodge is determined not to constitute an enforceable contract, Plaintiff nevertheless had an existing and prospective economic relationship with Stillpoint Lodge pursuant to which Plaintiff was scheduled to begin employment as a seasonal chef on May 15, 2026.

427. Defendant McLean knew of Plaintiff's prospective employment relationship with Stillpoint Lodge and knew that Plaintiff intended to begin

working for Stillpoint Lodge immediately following the conclusion of his lodging arrangement with McLean.

428. McLean had a preexisting relationship with Stillpoint Lodge and its management and represented to Plaintiff that she knew individuals associated with Stillpoint Lodge.

429. During the events leading to Plaintiff's removal from Between Beaches, McLean threatened to contact Stillpoint Lodge concerning Plaintiff and represented that Plaintiff's conduct would jeopardize his anticipated employment.

430. McLean thereafter contacted and/or communicated with Stillpoint Lodge concerning Plaintiff.

431. Upon information and belief, McLean intentionally communicated information concerning Plaintiff to Stillpoint Lodge with the intent to disrupt Plaintiff's prospective employment relationship and/or prevent Plaintiff from obtaining the anticipated employment.

432. McLean's conduct interfered with Plaintiff's prospective employment relationship with Stillpoint Lodge.

433. Shortly thereafter, Stillpoint Lodge informed Plaintiff that he would not be employed as anticipated and would not begin work on May 15, 2026.

434. McLean's conduct was a substantial factor in disrupting and/or preventing Plaintiff's prospective employment relationship with Stillpoint Lodge.

435. McLean's interference was not privileged or justified and was undertaken for an improper purpose.

436. As a direct and proximate result of McLean's intentional interference, Plaintiff suffered damages, including lost wages, lost employment opportunities, consequential economic losses, and other damages in an amount to be determined at trial.

437. Plaintiff is entitled to recover all damages and other relief available under Alaska law.

## COUNT XXVI

***Alaska Human Rights Act Employment Discrimination***

*(Plaintiff against The Alaska Centre for Creative Renewal, LLC d/b/a Stillpoint Lodge)*

438. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

439. Defendant The Alaska Centre for Creative Renewal, LLC d/b/a Stillpoint Lodge ("Stillpoint") was Plaintiff's prospective employer and/or employer within the meaning of the Alaska Human Rights Act.

440. Stillpoint offered Plaintiff employment as a seasonal chef, with an anticipated start date of May 15, 2026.

441. Plaintiff accepted Stillpoint's offer of employment, signed the employment agreement provided by Stillpoint, and remained ready, willing, and qualified to perform the essential functions of the position.

442. Plaintiff is an individual with a physical disability protected by the Alaska Human Rights Act.

443. Plaintiff's disability did not prevent him from performing the essential functions of the seasonal chef position.

444. As alleged herein, Defendant McLean knew of Plaintiff's disability and threatened that Stillpoint would not employ Plaintiff if Stillpoint learned of his disability.

445. McLean further threatened that Stillpoint would "hear about" Plaintiff and thereafter communicated with JT Thurston and/or other representatives of Stillpoint concerning Plaintiff.

446. Upon information and belief, McLean disclosed Plaintiff's disability and/or information concerning Plaintiff's disability to Stillpoint before Stillpoint terminated or repudiated Plaintiff's anticipated employment.

447. Shortly after McLean's communications with Stillpoint, Stillpoint informed Plaintiff that he would not be employed as anticipated and would not begin employment on May 15, 2026.

448. Plaintiff's disability was a motivating factor in Stillpoint's decision to refuse, terminate, rescind, and/or otherwise bar Plaintiff from the employment previously offered to him.

449. Stillpoint thereby discriminated against Plaintiff because of his physical disability in violation of AS 18.80.220.

450. As a direct and proximate result of Stillpoint's unlawful discrimination, Plaintiff suffered lost wages, lost employment benefits and opportunities, emotional distress, humiliation, economic loss, and other damages in an amount to be determined at trial.

451. Plaintiff is entitled to all damages and other relief available under the Alaska Human Rights Act.

## COUNT XXVII
## Breach of Employment Contract

*(Plaintiff against Stillpoint / The Alaska Centre for Creative Renewal, LLC)*

452. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

453. Stillpoint Lodge offered Plaintiff employment as a Commis Chef with a scheduled start date of May 15, 2026, and Plaintiff accepted Stillpoint's offer.

454. Thereafter, and after Plaintiff informed Stillpoint that he had purchased airfare to Alaska in reliance upon the accepted offer of employment, Stillpoint transmitted its 2026 Seasonal Employee Agreement to Plaintiff for electronic signature.

455. Plaintiff electronically signed the Employee Agreement on April 21, 2026.

456. The parties agreed upon the material terms of Plaintiff's employment, and their words, communications, and conduct objectively manifested mutual assent and an intent to be bound.

457. Stillpoint knew that Plaintiff was relying upon its offer and representations of employment and that Plaintiff had purchased airfare and

was traveling to Alaska in anticipation of beginning employment on May 15, 2026.

458. After Plaintiff signed the Employee Agreement and traveled to Alaska, Stillpoint continued communicating with Plaintiff concerning his anticipated employment.

459. Plaintiff performed all obligations required of him before his scheduled start date and remained ready, willing, and able to perform his obligations under the employment agreement.

460. To the extent any further performance by Plaintiff was required, Stillpoint's repudiation and refusal to employ Plaintiff prevented and/or excused Plaintiff's further performance.

461. Before Plaintiff's scheduled start date, Stillpoint repudiated and/or terminated the parties' employment agreement and informed Plaintiff that he would not begin employment as previously agreed.

462. Stillpoint asserted that no binding employment agreement existed because Stillpoint had not executed its own signature on the written Employee Agreement.

463. Stillpoint's failure to execute the written Employee Agreement did not negate the parties' prior offer and acceptance, mutual assent to the material terms of employment, or objective manifestations of their intent to be bound.

464. By refusing to employ Plaintiff pursuant to the parties' agreement, Stillpoint materially breached and/or anticipatorily repudiated the employment contract.

465. Stillpoint's breach and/or repudiation directly and proximately caused Plaintiff to suffer damages, including lost wages, lost employment benefits, reliance expenses, consequential economic losses, and other damages in an amount to be determined at trial.

466. Plaintiff is entitled to recover all damages and other relief available under Alaska law.

## COUNT XXVIII

### *Promissory Estoppel*

*(Plaintiff against The Alaska Centre for Creative Renewal, LLC d/b/a Stillpoint Lodge)*

467. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

468. Plaintiff pleads this claim in the alternative to his claim for Breach of Employment Contract pursuant to Federal Rule of Civil Procedure 8(d).

469. Stillpoint promised Plaintiff employment as a Commis Chef beginning on or about May 15, 2026.

470. Stillpoint communicated the offer of employment to Plaintiff, Plaintiff accepted the offer, and Stillpoint represented that it would transmit an employment agreement to Plaintiff for electronic signature.

471. In reliance upon Stillpoint's promise of employment, Plaintiff purchased airfare to Alaska for April 24, 2026.

472. Before Plaintiff traveled to Alaska, Plaintiff expressly informed Stillpoint that he had purchased airfare in reliance upon the accepted offer of employment and requested that Stillpoint send him the employment agreement for signature.

473. With knowledge of Plaintiff's reliance, Stillpoint transmitted its 2026 Seasonal Employee Agreement to Plaintiff for electronic signature on April 21, 2026.

474. Plaintiff signed the Employee Agreement that same day.

475. Stillpoint thereafter continued communicating with Plaintiff concerning his anticipated employment, including after Plaintiff traveled to Alaska.

476. Stillpoint reasonably should have expected that its promise of employment, transmission of the Employee Agreement for Plaintiff's signature, and subsequent communications concerning Plaintiff's anticipated employment would induce Plaintiff to take action in reliance upon the promised employment.

477. Stillpoint's promise and representations did in fact induce Plaintiff to act in reliance upon them.

478. In reasonable reliance upon Stillpoint's promise and representations, Plaintiff purchased airfare, traveled to Alaska, transported his personal belongings to Alaska, and organized his housing, employment, and other affairs around beginning employment with Stillpoint on May 15, 2026.

479. Plaintiff's reliance upon Stillpoint's promise of employment was reasonable and foreseeable.

480. Stillpoint thereafter refused to employ Plaintiff as promised and asserted that the Employee Agreement was ineffective because Stillpoint had not executed its own signature on the agreement.

481. Under the circumstances alleged herein, injustice can be avoided only by enforcement of Stillpoint's promise and/or an award of appropriate relief for Plaintiff's detrimental reliance upon that promise.

482. As a direct and proximate result of Plaintiff's reasonable reliance upon Stillpoint's promise, Plaintiff suffered damages, including reliance expenses, lost employment income, consequential economic losses, and other damages in an amount to be determined at trial.

483. Plaintiff is entitled to all relief available under Alaska law.

**COUNT XXIX**

**Breach of the Implied Covenant of Good Faith and Fair Dealing**

*(Plaintiff against The Alaska Centre for Creative Renewal, LLC d/b/a Stillpoint Lodge)*

484. Plaintiff realleges and incorporates by reference all preceding paragraphs as though fully set forth herein.

485. Plaintiff and Stillpoint entered into an employment agreement pursuant to which Plaintiff was scheduled to begin employment as a Commis Chef on May 15, 2026.

486. The employment agreement included an implied covenant of good faith and fair dealing.

487. Under the implied covenant, Stillpoint was prohibited from intentionally depriving Plaintiff of a benefit of the employment agreement and was required to treat Plaintiff in a manner that a reasonable person would regard as fair.

488. Stillpoint knew that Plaintiff relied upon its offer and representations of employment by purchasing airfare, traveling to Alaska, transporting his personal belongings, and arranging his housing and affairs around his anticipated employment.

489. With knowledge of Plaintiff's reliance, Stillpoint transmitted the Employee Agreement to Plaintiff for electronic signature, accepted Plaintiff's signed agreement, and continued communicating with Plaintiff concerning his anticipated employment.

490. Stillpoint thereafter repudiated and/or terminated Plaintiff's employment before his scheduled start date and asserted that the Employee Agreement was ineffective because Stillpoint had not executed its own signature on the agreement.

491. By inducing and permitting Plaintiff's substantial reliance upon the employment agreement and thereafter relying upon its own failure to sign the agreement as a basis for denying Plaintiff the promised employment, Stillpoint deprived Plaintiff of a benefit of the employment agreement in a manner that a reasonable person would regard as unfair.

492. Upon information and belief, Stillpoint's decision was additionally influenced by communications from Defendant McLean concerning Plaintiff, including information concerning Plaintiff's disability and/or other private matters, as alleged herein.

493. Upon information and belief, Stillpoint intentionally deprived Plaintiff of the benefits of the employment agreement and/or acted in a manner that a reasonable person would regard as unfair.

494. Stillpoint thereby breached the implied covenant of good faith and fair dealing.

495. As a direct and proximate result of Stillpoint's breach, Plaintiff suffered lost wages, lost employment benefits and opportunities, reliance expenses, consequential economic losses, and other damages in an amount to be determined at trial.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against Defendants, as applicable, and award the following relief:

(a) Declaratory relief and such other equitable relief as the Court deems appropriate;

(b) Economic damages, including lost wages, lost employment benefits, reliance damages, out-of-pocket expenses, and other economic losses, to the extent recoverable by law;

(c) Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of dignity, loss of enjoyment of life, and other noneconomic injuries, to the extent recoverable by law and in an amount to be determined at trial;

(d) Punitive damages against those Defendants and on those claims for which punitive damages are authorized by law, in an amount to be determined at trial;

(e) Reasonable attorneys' fees, litigation expenses, expert-witness fees, and costs to the extent authorized by 42 U.S.C. § 1988, the Fair Housing Act, and other applicable law;

(f) Prejudgment and post-judgment interest to the extent permitted by law; and

(g) Such other and further legal or equitable relief as the Court deems just and proper.

## VII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

DATED: August 25, 2026

/s/ *Katherine R. Wagner*
Katherine R. Wagner
Alaska Bar No. 2503016
INLET LAW, LLC
Anchorage Office
1007 W. 3rd Ave., Suite 300
Anchorage, AK 99501
(907) 759-8765

INLET LAW, LLC
Main Office
4089 Pennock St.
Homer, AK 99603
(907) 299-6572

Filings@inlet-law.com

*Counsel for Plaintiff*